J-S47027-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: D.R.H., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: M.H., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 740 MDA 2019 |

Appeal from the Decree Entered April 8, 2019
In the Court of Common Pleas of Lebanon County Orphans' Court at
No(s):  2019-8

BEFORE:  DUBOW, J., NICHOLS, J., and MUSMANNO, J.

MEMORANDUM BY NICHOLS, J.:          **FILED: OCTOBER 18, 2019**

M.H. (Father) appeals from the decree granting the petition filed by A.L. (Mother) and her husband, D.L. (Stepfather), seeking to involuntarily terminate Father's parental rights to D.R.H. (Child), born in February of 2009, pursuant to the Adoption Act, 23 Pa.C.S. § 2511(a)(1) and (b).  We affirm.

The trial court summarized the early years of Mother, Father, and Child's relationships as follows:

> From [Child's] birth until approximately January of 2011, Mother and [Father] were living together with some friends in an apartment.  Toward the end of that arrangement, [Stepfather] would stay overnight as a friend.  Mother testified that, at that time, she and [Father] were no longer involved with each other and that she and [Stepfather] were developing a relationship.
>
> Around January of 2011, [Stepfather] purchased a home and Mother, [Stepfather] and [Child] moved in together.  Another couple with a child also moved into the house to help financially.
>
> While Mother and [Father] were still together, [Child] would see her paternal grandparents ("Paternal Grandparents") usually   on

holidays. After Mother moved in with [Stepfather], visitation with Paternal Grandparents was sporadic with [Child] visiting with [Paternal] Grandparents maybe twice a year. . . .

In March of 2011, Mother and [Father] came to an agreement by which [Father] would have visits with [Child] every other weekend and on occasions with notice. At that time, [Father] was providing $200 per month for expenses. [Father's] visits with [Child] stopped in September of 2012 as the result of concerns over care of [Child] when in [Father's] custody.

Thereafter, on December 22, 2012, [Father] arrived at Mother's home, unannounced, and requested to say goodbye to [Child] because he was moving to Oklahoma. Mother refused the request indicating that [Child] was sleeping and she did not want to wake [Child] when she had not seen [Father] in three months. [Father] further inquired as to a possible custody arrangement, but Mother "informed [Father that she] would not be putting a three-year-old on a train to Oklahoma." [Father] did not provide Mother with an address in Oklahoma. Mother stated that she continued to receive the $200 payments from [Father] until at least September of 2012.

* * *

[Father] testified that he was at the hospital when [Child] was born and remembers being very happy. [Father] stated that after [Child] was born, he supported both [Child] and Mother financially, as well as helping in the care of [Child].

[Father] then testified that after Mother moved out with [Stepfather], [Child] was still spending weekends with him, that he and [Child] would spend time with his family on their farm where [Child would] play in the water, sand and dirt and get dirty prior to [Father] returning [Child] to Mother. [Father] stated that Mother called [Father] to complain that [Child] was coming back dirty and that [Father] was returning the bag with [Child's] clothes in it unused, though [Father] claims that he had bought clothes for [Child] to wear while they were together. [Father] testified that during the phone call with Mother, he "got from her the impression that [Father] wasn't allowed to really see [Child] or have communication with [Mother and Child]." [Father] indicated that his impression that he would not be allowed to see [Child]

was not premised on anything Mother actually said, but instead on "the tone [of Mother during the conversation] and knowing her for as long as [he] did." [Father] additionally stated that he did not believe that he could elicit financial help from Paternal Grandparents in pursuit of any custody action because Paternal Grandparents "are not big fans of [c]ourts [and t]hey would rather try to work things out without getting the [c]ourts involved."

[Father] testified that while he and Mother and [Child] were still living in the house together, they fell behind on the mortgage payments. This led to the house being foreclosed upon and go[i]ng [to] the sheriff's sale in October of 2012. [Father] worked in the construction industry and the business was slow and there was not an abundance of work for [Father]. After the house was sold, [Father] moved in with [Paternal] Grandparents. Within two months of living . . . with [Paternal] Grandparents, [Father] had an opportunity to move to Oklahoma. [Father] stated that the reason for his move to Oklahoma was because he lost his house, his job and [Child] and that he felt he had to start over and he was trying to provide a better situation for himself. So [Father] had the opportunity to move to Oklahoma where there was a better economy and he could reestablish himself.

[Father] recalled the night that he visited Mother before leaving for Oklahoma with the intention to ask "permission to stay in contact with [Child]." [Father] stated that Mother "acted like she didn't care if [Father] moved" and told [Father] "that it would probably not be in the best interest of [Child] to try and contact them." [Father] asked to call [Child], but Mother responded that [Father] "would probably just stop over time." [Father] admitted that he did stop contacting [Child] after moving to Oklahoma.

Trial Ct. Op., 5/28/19, at 2-4, 6-7. Mother and Stepfather had another child, Ad.L. (Stepsister), who was born in 2012 or 2013.

The trial court discussed the following events after Father moved to Oklahoma in December of 2012:

In or around December of 2015, while [Mother, Stepfather, Child, and Stepsister] celebrated Christmas with [Paternal] Grandparents, [Paternal] Grandmother gave Mother a gift and

stated that the gift was from [Father]. Mother informed Paternal Grandmother that they could tell [Child] that the gift was from Santa or from Paternal Grandparents, but that she wouldn't allow the gift to bear [Father's] name because at that point, [Child] had not seen [Father] in three years and Mother considered [Father] as a stranger to [Child]. Mother did not receive any other gifts, cards or money from [Father], including for [Child's] birthdays, after [Father] moved to Oklahoma.

[In or around the summer of 2016, Mother's entire family, including Mother, Stepfather, Child, and Stepsister, began visiting with Paternal Grandparents more often with visits at least every other month and on holidays and birthdays. Mother testified that the relationship with Paternal Grandparents was positive and that Paternal Grandparents are welcoming of Child, as well as Stepsister.]

Mother testified that she saw [Father] in September of 2018. Mother testified that between September of 2012 and September of 2018, she did not receive any electronic, telephonic or postal communication from [Father]. . . .

In September of 2018, at the behest of Paternal Grandparents, Mother and [Stepfather] met with [Father] at Paternal Grandparents' property where [Father] expressed a desire to reestablish his relationship with [Child]. Mother recounted how [Child] had expressed the desire to be adopted by [Stepfather] and take his last name. Mother testified that [Father] then stated that he would sign a voluntary termination in [Child's] best interests so that the adoption could proceed. During the conversation, [Father] expressed interest in reestablishing the relationship with [Child]. Mother told [Father] that she would consider allowing [Father] to be re-acclimated as a peripheral part of [Child's] life if [Father] could demonstrate that he was establishing himself in the area by maintaining a residence and a good job. [Father] did not attend any school functions for [Child] or participate in any extra-curricular activities. Mother testified that [Father] was not barred from attending any school activities or from any hobby activities.

Upon prompting from classmates at school as to why [Child] and [Stepsister] had different last names, [Child] asked [Paternal] Grandparents if [Paternal] Grandfather was her father, since they shared the same last name. Mother also testified that in the

summer of 2018, [Child] asked Mother and [Stepfather] why her last name was different from theirs. Mother provided a general explanation that did not name [Father] specifically. Mother and [Child] then discussed whether [Child] wanted to change her last name. [Child] needed to think about it and then came to Mother and [Stepfather] after a few days stating that she did want to change her last name to be the same as Mother and [Stepfather].

Trial Ct. Op., 5/28/19, at 4-5 (record citations omitted); *see also id.* at 3.

Mother and Stepfather filed a petition to terminate Father's parental rights on January 2, 2019.[1] Father filed an answer and affirmative defenses, as well as a motion for discovery. The trial court "did not grant the [motion for discovery] and filed [Father's proposed order] as 'unsigned' on March 11, 2019." *Id.* at 1.

On April 4, 2019, the trial court held an evidentiary hearing on the petition, at which the parties appeared with counsel, and Loreen Marae Burkett, Esq., (Child's counsel) represented Child. [2] Mother and Stepfather

_____

[1] Shortly after Mother and Stepfather filed the petition to terminate Father's parental rights, Father filed a complaint in custody. Additionally, Father sent Mother a check for $150, with Child's name in the memo line.

[2] The trial court appointed Child's counsel to "represent [Child] and protect her rights in" the termination hearing. Order, 1/2/19. Therefore, Child's right to counsel under 23 Pa.C.S. § 2313(a) was satisfied. *See In re Adoption of K.M.G.*, ____ A.3d ____, 2019 PA Super 281, 2019 WL 4392506, at * 4 (Pa. Super. filed Sept. 13, 2019) (*en banc*) (emphasis in original) (holding that (1) ~~that~~ "this Court's authority is limited to raising *sua sponte* the issue of whether the orphans' court violated Section 2313(a) by failing to appoint **any** counsel for the Child in a termination hearing," and (2) we may not "review *sua sponte* whether a conflict existed between counsel's representation and the child's stated preference in an involuntary termination of parental rights proceeding" (citations omitted) (emphasis in original)). We add that there was no

testified on their own behalf and presented the testimony of K.M., a family friend, and L.D., another family friend and Mother's employer. N.T., 4/4/19, at 6, 85, 102, 106-07. Father testified on his own behalf, and presented the testimony of his sister, M.J., and Paternal Grandparents. *Id.* at 110, 248, 266, 288. The trial court denied Father's offer of Father's aunt, J.B. (Paternal Aunt), as a witness. *Id.* at 301.

The trial court terminated Father's parental rights in a decree dated April 4, 2019, and entered on April 8, 2019. Father timely filed a notice of appeal, along with a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b). The trial court filed a responsive Rule 1925(a) opinion.[3]

_____

apparent conflict between Child's best interests and legal interests. *See id.; see also In re T.S.*, 192 A.3d 1080, 1089-90, 1092-93 (Pa. 2018) (reaffirming the ability of an attorney-guardian ad litem to serve a dual role and represent a child's non-conflicting best interests and legal interests); *In re Adoption of L.B.M.*, 161 A.3d 172, 174-75, 180 (Pa. 2017) (plurality) (stating that, pursuant to 23 Pa.C.S. § 2313(a), a child who is the subject of a contested involuntary termination proceeding has a statutory right to counsel who discerns and advocates for the child's legal interests, defined as a child's preferred outcome).

[3] In his concise statement, Father raised twenty issues, and, in its Rule 1925(b) opinion, the trial court addressed the related issues together. On appeal, Father has interwoven some of the related issues from his concise statement into the four issues.

In his concise statement, Father alleged that this is a case of first impression because he would have been required to act in bad faith to preserve a relationship with Child and because his parents performed his parental duties

In its opinion, the trial court concluded that termination was appropriate under Section 2511(a)(1) and (b). The trial court explained:

> We found Mother's testimony to be credible. We found [Stepfather] to be credible, consistent and stable[,] and that he has taken responsibility for [Child] and raised [Child] as his own child. We found the argument from [Father,] that cards, letters, etc., had they been sent, would have been rejected[, was] incredible and unsupported by any credible evidence or testimony. We found . . . that [Father] failed to perform his parental duties for at least six months prior to the [filing of the petition]. We found that [Father] has no bond with [Child]. Conversely, we found that [Stepfather] had a clear bond with [Child] and treats [Child] as his own child. Thereafter, we granted the [p]etition to terminate [Father's] parental rights as to [Child].

Trial Ct. Op., 5/28/19, at 10-11 (footnote omitted).

> Father raises the following issues for review:
>
> 1. Whether the trial court committed prejudicial error in failing to consider the deliberately created obstacles and erected barriers by Mother and/or [Stepfather], to impede on free communication and regular association with the Child by Father, as well as[] the general performance of his parental duties.
>
> 2. Whether the trial court committed prejudicial error in failing to consider the best interest of the Child and the effect that severing the parental relationship between Father and the Child[] would have upon the Child's current and future developmental, physical, and emotional needs and welfare.
>
> 3. Whether the trial court committed prejudicial error in refusing to allow Father to perform discovery, especially given that a fundamental right is at stake.

---

in his absence. Father does not raise these issues in the statement of questions involved section of his brief on appeal. Therefore, Father has waived these issues. **See Krebs v. United Refining Co. of Pa.**, 893 A.2d 776, 797 (Pa. Super. 2006)

4. Whether the trial court committed prejudicial error by excluding testimony about the best interest of the child.

Father's Brief, at 4-5.

In reviewing an appeal from an order terminating parental rights, we adhere to the following standard:

> [A]ppellate courts must apply an abuse of discretion standard when considering a trial court's determination of a petition for termination of parental rights. As in dependency cases, our standard of review requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. [**In re R.J.T.**, 9 A.3d 1179, 1190 (Pa. 2010)]. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. As has been often stated, an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion. Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will.
>
> As we discussed in **R.J.T.**, there are clear reasons for applying an abuse of discretion standard of review in these cases. We observed that, unlike trial courts, appellate courts are not equipped to make the fact-specific determinations on a cold record, where the trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents. Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion.

**In re Adoption of S.P.**, 47 A.3d 817, 826-27 (Pa. 2012) (some citations omitted).

The burden is upon the petitioner to prove by clear and convincing evidence that the asserted grounds for seeking the termination of parental rights are valid. *In re R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009). Moreover, we have explained that "[t]he standard of clear and convincing evidence is defined as testimony that is so 'clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue.'" *Id.* (citation omitted).

This Court may affirm the trial court's termination of parental rights if any one subsection of Section 2511(a) and Section 2511(b) has been established. *See In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). Here, we focus on Section 2511(a)(1) and (b), which provide:

**§ 2511. Grounds for involuntary termination**

**(a) General rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

\* \* \*

**(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant

to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(1), (b).

Father first argues that the trial court erred in finding that he failed to perform his parental duties in the six months before Mother and Stepfather filed the petition to terminate his parental rights. Father's Brief at 21 (discussing 23 Pa.C.S. § 2511(a)(1)). Specifically, Father emphasizes that he made efforts to reestablish contact with Child in the six months before the filing of the petition. *Id.* at 21-23.

Father further asserts that the trial court failed to consider the obstacles and barriers raised by Mother. *Id.* at 26-30. Father argues that his explanations for failing to contact Child were reasonable in light of Mother's conduct and his introverted, non-confrontational personality. *Id.* at 30-32.

With respect to Section 2511(a)(1), our Supreme Court has held as follows.

Once the evidence establishes a failure to perform parental duties or a settled purpose of relinquishing parental rights, the court must engage in three lines of inquiry: (1) the parent's explanation for his or her conduct; (2) the post-abandonment contact between parent and child; and (3) consideration of the effect of termination of parental rights on the child pursuant to Section 2511(b).

*Matter of Adoption of Charles E.D.M., II*, 708 A.2d 88, 92 (Pa. 1988) (citation omitted).

- 10 -

Further, this Court has stated:

Although it is the six months immediately preceding the filing of the petition that is most critical to the analysis, the trial court must consider the whole history of a given case and not mechanically apply the six-month statutory provision. The court must examine the individual circumstances of each case and consider all explanations offered by the parent facing termination of his or her parental rights, to determine if the evidence, in light of the totality of the circumstances, clearly warrants the involuntary termination.

*In re B., N.M.*, 856 A.2d 847, 855 (Pa. Super. 2004) (citations omitted).

Regarding the definition of "parental duties," this Court has stated:

There is no simple or easy definition of parental duties. Parental duty is best understood in relation to the needs of a child. A child needs love, protection, guidance, and support. These needs, physical and emotional, cannot be met by a merely passive interest in the development of the child. Thus, this court has held that the parental obligation is a positive duty which requires affirmative performance.

\* \* \*

Parental duty requires that the parent act affirmatively with good faith interest and effort, and not yield to every problem, in order to maintain the parent-child relationship to the best of his or her ability, even in difficult circumstances. A parent must utilize all available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship. Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with his or her physical and emotional needs.

*Id.* (citations omitted).

Instantly, the trial court found:

We recognize that [Father] was involved in [Child's] life for the first three years of her life. While Mother and [Father] lived together, [Father] provided for both Mother and [Child,] and helped in the care of [Child]. After Mother and [Child] moved out of the house and in with [Stepfather], [Father] continued visitation with [Child], even taking [Child] on trips to [Paternal] Grandparents' house on weekends. While there is some disagreement as to the particulars, there is consistency in the testimony that Mother had an issue with [Father's] visitation periods and some restrictions were imposed. However, [Father] never took any proactive action to reestablish his visitations or to exert his custodial rights after the incident.

In December of 2012, [Father showed] up at Mother's house to inform her that he [was] moving to Oklahoma and request[ed] some kind of custodial agreement, which Mother understandably deni[ed]. [Father] did not provide Mother with an address to which he was moving or indicate that he had any plan to make any custodial agreement work. Meanwhile, [Father] knew Mother's address and phone number in order to contact [Child].

While in Oklahoma, [Father] did not even attempt to contact Mother in order to speak with [Child]. [Father] did not initiate any direct contact through [Paternal] Grandparents in order to facilitate contact with [Child]. [Father] did not send letters, cards or financial support to Mother for [Child,] and with the exception of one Christmas, failed to send any gifts for [Child]. As to Mother's request that a gift, sent nearly three years after [Father left] the state and with no contact with [Child], be designated from Santa or from Paternal Grandparents instead of from [Father] in order not to confuse [Child], we find such to be completely understandable. [Father] made no effort to maintain or reestablish a relationship with [Child].

[Father] responds that any efforts **would have** been rebuffed by Mother. Additionally, [Father] contends that his introverted and non-litigious nature predispose him to a passive approach[,] in which settlement of matters is attempted beyond the scope of the courts.

While "[t]he law recognizes . . . that there are situations in which a custodial parent has deliberately created obstacles and has by devious means erected barriers intended to impede free

communication and regular association between a noncustodial parent and his or her child[,]" a parent is still required to "use all available resources to preserve the parental relationship and must exercise 'reasonable firmness' in resisting obstacles placed in the path of maintaining the parent-child relationship." Therefore, "[t]he pertinent inquiry is not the degree of success a parent may have had in reaching the child, but whether, under the circumstances, the parent has utilized all available resources to preserve the parent-child relationship." Furthermore, "[p]arental rights are not preserved, it has been held, by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with his or her immediate physical and emotional needs."

First, [Father] presented no evidence that Mother created any undue obstacles to the maintenance of a parent-child relationship between [Father] and [Child]. Testimony from [Father] and family members indicate that everyone believed that they were "walking on eggshells" in order to comply with Mother's wishes. However, no one could provide solid evidence or recount an instance that would justifiably support such belief. The fact that Mother restricted [Father's] access to [Child] in 2012, regardless of the circumstances, does not prohibit [Father] from exercising his legal rights, or from requesting information from Mother, or f[ro]m providing support, letters or cards to Mother for [Child]. However, [Father] failed to attempt contact of any kind.

Next, despite any allegations of obstacles or barriers, [Father] did not even attempt to overcome any such barriers or obstacles. We find that a parent's introverted or non-combative nature is no defense against a failure to perform parental duties. [Father] could have written a letter or card or sent money. His defense is that he believed it would be rejected, but again, no proof was asserted that this was the case. In fact, not one witness could recount an example of such a circumstance (other than a single instance regarding the gift necklace) or a conversation in which Mother stated that she would reject communication from [Father]. If a parent could justify non-performance of parental duties because of a passive nature, general timidity or a reluctance to utilize the justice system, it would most certainly lead down a path injurious to the children involved. We see no merit in [Father's] explanation for his conduct in the six years prior to the filing of the [p]etition.

- 13 -

[Father] also asserts that [Paternal] Grandparents acted as proxies in lieu of his own performance of parental duties. We find this argument lacking as well. A parent may not wholly delegate his or her responsibility to another party in order to fulfill his or her parental duties. While we find that [Paternal] Grandparents were consistently involved in [Child's] life and have established and maintained a good relationship with Mother and [Stepfather], this cannot supplant [Father's] own obligation to perform even the most basic of parental duties. [Father] has not provided a single instance in which he had even attempted to make contact with [Child] in the six years prior to the filing of the [p]etition.

Finally, [Father] asserts that he made efforts in the six months prior to the filing of the [p]etition[,] in that he returned to Pennsylvania and had [Paternal] Grandparents arrange for a meeting in which reestablishment of the relationship was discussed. In termination proceedings, we "may consider post-petition efforts if the efforts were initiated before the filing of the termination petition and continued after the petition date." At the time of the meeting, when it was expressed that Father sought to reestablish the relationship between himself and [Child], Mother set forth conditions in which [Father] might be reintroduced into [Child's] life, though on the periphery and not as Child's father. [Father] maintains that this is evidence of an obstacle by Mother. The Superior Court has noted:

> Parents may not have contact with a child for six months or more and then realize that they have made a terrible mistake. Their renewed efforts at assuming parental responsibilities will not cure prior abandonment but may demonstrate a serious intent to establish and continue a child-parent relationship that will be important and beneficial to the child. To be legally significant the contact must be steady and consistent over a period of time, contribute to the psychological health of the child, and must demonstrate a serious intent on the part of the parent to recultivate a parent-child relationship and must also demonstrate a willingness and capacity to undertake the parental role.

[Father] made no demonstration that contact was steady and consistent since he made no[] significant effort to reestablish

contact with [Child].  Further, [Father] did not establish a serious intent to recultivate the relationship or show that he had the willingness or capacity to undertake the parental role.  Likewise, [Father] failed to exhibit that reestablishing the relationship would contribute to the psychological health of [C]hild.

Given the overwhelming evidence and testimony, we find that [Father] failed to perform his parental duties for a period of more than six months prior to the filing of the [p]etition.  [Father's] arguments, though interesting and presented with fervency, are unavailing to convince this court to find differently in contravention to the established case law and the intentions of the General Assembly.

Trial Ct. Op., 5/28/19, at 20-24 (citations omitted) (emphasis in original).

We conclude that the trial court's decision to terminate the parental rights of Father under Section 2511(a)(1) is supported by competent, clear and convincing evidence in the record.  *See S.P.*, 47 A.3d at 826-27.  The trial court considered and accorded little to no weight to Father's contentions that Mother unduly impeded his ability to contact Child and Father's explanations for his failure to exercise his parental duties for nearly six years.  Therefore, having reviewed the record, we discern no abuse of discretion or error of law in the trial court's conclusion regarding Section 2511(a)(1).

In his second claim, Father asserts that the trial court failed to consider Child's best interests and the effect of severing his relationship with Child.  *See* Father's Brief at 4.  Father contends that Child "had significant emotional attachment to [him] during her childhood" and that this bond would have continued "but for Mother's interference."  *Id.* at 45.  Father also argues that

- 15 -

Child has significant attachments to Paternal Aunt, Paternal Grandparents, and her cousins. *Id.* at 46.

Additionally, Father notes that Child was aware that Stepfather was not her birth father, but she shared the same last name as Paternal Grandparents. Father notes that Mother did not allow him or his family to identify him as Child's birth father. Nevertheless, Father notes Child expressed an interest in writing a letter introducing herself to her birth father. *Id.* at 47. Father emphasizes that he does not want to take custody of Child from Mother, but wants to "continue making himself part of [Child's] life." *Id.* He concludes his rights should not be terminated because "the contact will allow . . . Child to continue to feel loved by her biological father and may preclude Child's painful search for [Father] as a teen or an adult and the emotional injuries caused by separation." *Id.* at 47-48.

Father notes that Child's counsel only indicated that Child wanted to change her last name. However, he asserts Child's counsel did not discuss the effect termination would have on Child. *Id.* at 46. In sum, Father claims that "it was not clear that the termination would serve the best interests of [Child]." *Id.* at 49.

This Court has stated that the focus in terminating parental rights under Section 2511(a) is on the parent, but the focus of Section 2511(b) is on the child. *In re Adoption of C.L.G.*, 956 A.2d 999, 1008 (Pa. Super. 2008) (*en*

*banc*). In reviewing the evidence in support of termination under Section 2511(b), our Supreme Court has stated as follows:

> [I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S. § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include "[i]ntangibles such as love, comfort, security, and stability." In *In re E.M.*, 620 A.2d [481, 485 (Pa. 1993)], this Court held that the determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (some citations omitted).

When evaluating a parental bond, "the court is not required to use expert testimony. Social workers and caseworkers can offer evaluations as well. Additionally, Section 2511(b) does not require a formal bonding evaluation." *In re Z.P.*, 994 A.2d 1108, 1121 (Pa. Super. 2010) (citations omitted). Although it is often wise to have a bonding evaluation and make it part of the certified record, "[t]here are some instances . . . where direct observation of the interaction between the parent and the child is not necessary and may even be detrimental to the child." *In re K.Z.S.*, 946 A.2d 753, 762 (Pa. Super. 2008).

Instantly, the trial court noted:

> The record reflects that while in chambers during a meeting with all counsel, this court specifically asked [Child's counsel] her position on the matter. [Child's counsel] noted that, after speaking with [Child], she concluded that [Child] does not have any relationship with [Father] and that no bond has been formed

between [Father] and [Child]. . . . [Child's counsel] maintained that she "support[ed Child] in her position [as] to having her name changed, which is important to her."

At the close of trial, the [Child's counsel] reaffirmed that she met with [Child] in January. [Child] expressed to [counsel] that she desired to have her last name changed. While [Child] is still young, this is an indication that [Child] wants to move forward with the adoption. The [Child's counsel] likewise articulated that she felt the provisions of the statute were clearly met and she supported a finding that parental rights should be terminated.

Trial Ct. Op., 5/28/19, at 27.

As to Section 2511(b), the trial court summarized its finding as follows:

While the developed case law calls on the court to interpret any parent-child bond, "[i]n cases where there is no evidence of any bond between the parent and child, it is reasonable to infer that no bond exists."

We do not deny that a bond did exist at one time between [Father] and [Child]. However, [Father's] failure to perform his parental duties have eroded that bond to the point of extinction. . . .

Conversely, a strong parental bond does exist between [Stepfather] and [Child]. [Stepfather] treats [Child] as his own child. [Stepfather] is involved in the everyday activities and routines of [Child]. [Child] refers to [Stepfather] as "Daddy" and has expressed the desire to change her last name in order to comport with that of Mother and [Stepfather].

Mother and [Stepfather] provide[] a family environment and a safe home for [Child]. Mother and [Stepfather] share financial responsibility for [Child]. Mother and [Stepfather] are both involved in [Child's] school and extra-curricular activities and interests. Furthermore, Mother and [Stepfather] have been supportive of preserving the bond that [Child] has with [Paternal] Grandparents.

We find that with no bond existing between [Father] and [Child], there was no foreseeable detrimental effects in severing the relationship. [Father] did not demonstrate that he could provide a stable environment for [Child], though we acknowledge he has

> expressed his desire so to do. We don't deny that [Father] loves [Child]. However, "[a] parent's own feelings of love and affection for a child, alone, do not prevent termination of parental rights." At this point, [Father] is a stranger to [Child] and[,] therefore, it is unlikely that she will find comfort, safety or stability in reestablishing the relationship. . . .

Trial Ct. Op., 5/28/19, at 24-27 (citations omitted).

Having reviewed the trial court's opinion and the record, we find no abuse of discretion or error of law in the trial court's decision to terminate the parental rights of Father under Section 2511(b). **See S.P.**, 47 A.3d at 826-27. Contrary to Father's arguments, the trial court considered factors relevant to the Child's needs and welfare as well as the effects of termination on Child. Therefore, no relief is due.

In his third issue, Father asserts that the trial court committed prejudicial error in refusing to allow Father to perform discovery. **See** Father's Brief at 4. Father argues that discovery would have revealed that Mother intended to testify to an alleged conversation Mother had with Father's roommate in August 2012. **Id.** at 52. Father does not summarize the substance of the allegations. However, it appears from the record that the allegations related either to Father's statements that he would leave Child with others during his periods of custody in 2012 or that he was unfaithful to Mother during their relationship. Father notes that the trial court sustained his hearsay objection to the testimony, but asserts that Mother's counsel continued to refer to the conversation. **Id.** at 52-53. He further contends that if he was made aware of Mother's intent to use the conversation, he could

- 19 -

have "subpoenaed [the roommate] to likely show Mother's untruthfulness and lack of credibility." *Id.* at 53. Father also suggests that the lack of discovery impaired his ability to substantiate his claim that Mother was obstructionist and untruthful. *Id.*

At the outset, we note that Father raised the following issue in his Rule 1925(b) statement: "Whether the [trial c]ourt committed prejudicial error in failing to allow . . . [Father] to perform discovery." Father's Rule 1925(b) Statement at ¶ 6. The trial court addressed this issue as follows:

> [Father] asserts in his sixth error complained of on appeal that this court committed prejudicial error in failing to allow [Father] to perform discovery. [In Father's] Motion for Leave to Allow Discovery, [Father] sought discovery as to alleged concerns regarding [Stepfather's] mental stability, Mother and [Stepfather's] alleged prevention of possession and access of [Child] by [Father], alleged misinformation of [Father's] whereabouts, an alleged plea in a criminal case by Mother[,[fn2]] and the potential divorce of Mother and [Stepfather] in the future. [Father] argued, at the time, that the discovery was necessary to support his contentions that he had been hindered in his efforts and to show that the requested adoption would not be in the best interests of [Child].
>
> > [fn2] We note that at the hearing on this matter, an allegation was made that Mother had been involved in a previous criminal matter; however, it was shown that the defendant in the criminal matter was, in fact, not Mother and this court cautioned counsel for [Father] as to the introduction of such without proper and adequate legal research.
>
> Leb.Co.O.C.R. No. 7.1, entitled "Depositions, Discovery and Production of Documents," provides that "[t]he Rules pertaining to Depositions, Discovery and Production of Documents 'as contained in the Pennsylvania Rules of Civil Procedure shall be 9 [sic] applicable to the Orphans' Court Division of the Court of

Common Pleas of Lebanon County." Pennsylvania Rule of Civil Procedure No. 4003.1(a) provides:

> Subject to the provisions of Rules 4003.2 to 4003.5 inclusive and Rule 4011, a party may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action, whether it relates to the claim or defense of the party seeking discovery or to the claim or defense of any other party, including the existence, description, nature, content, custody, condition and location of any books, documents, or other tangible things and the identity and location of persons having knowledge of any discoverable matter.

The decision of a trial court to grant or deny pre-trial discovery falls within the court's discretion. "In exercising its discretion, a trial court must assess whether the [party] can establish probable cause showing his requested discovery will materially advance a legally sufficient pleading." Moreover, "stewardship of the trial, including discovery rulings, are uniquely within the discretion of the trial judge, and, consequently, the court's rulings will not be reversed unless they are deemed to represent an abuse of discretion."

The discovery [matters] sought by [Father] were not relevant to the termination proceeding and[,] to the extent that any material sought was relevant, such could be provided through testimony at trial. [Father] sought discovery supporting the assertion that Mother denied all contact of [Father] with [Child] and that Mother and [Stepfather] likely provided false information to [Child] about [Father]. [Father] further sought to elicit discovery as to the stability of Mother and [Stepfather's] relationship as it relates to the proposed adoption.

The focus in an involuntary [termination proceeding] is on the conduct of the parent whose rights are the subject of the hearing. While introduction of obstructive behavior of the custodial parent may be introduced, such conduct would be apparent to the non-custodial parent and there would be little need for this court to authorize a fishing expedition in order to procure alleged schemes. "The burden is upon the petitioner to prove by clear and convincing evidence that the asserted grounds for seeking the termination of parental rights are valid." It would seem

counterintuitive for a court to allow the non-custodial parent to seek out methods of obstruction that were not apparent, especially if the parent failed to attempt to overcome those that were allegedly apparent.

As for [Father's] attempt to seek discovery as to the stability of the marriage between Mother and [Stepfather], as well as seeking records on [Stepfather's] mental health, we find such efforts appalling. It is true that "[a] petition to terminate a natural parent's parental rights, filed by one natural parent against the other under Section 2512(a)(1), is cognizable only if an adoption of the child is foreseeable." However, as our Supreme Court has stated: "The purpose of the involuntary termination provisions of the Adoption Act is not to punish an ineffective or negligent parent, or provide a means for changing the surname of the child, [but r]ather, . . . to dispense with the need for parental consent to an adoption when, by choice or neglect, a parent has failed to meet the continuing needs of the child." Section 2531(c) of the Adoption Act specifically exempts the need for a report of intention to adopt where the potential adoptive parent is a step-parent. Allowing the non-custodial parent, who is the subject of the involuntary termination proceeding, to seek and introduce evidence of the competency of the parties or of the potential relationship issues of the adopting parent, would override the intent of the legislature in allowing for such exemption. Therefore, [Father's] discovery motion sought discovery not relevant to the proceeding. We find no merit in the alleged error.

Trial Ct. Op., 5/28/19, at 27-30 (some footnotes omitted).

We find no error or abuse of discretion on the part of the trial court in denying Father's discovery motion. Moreover, we discern no merit to Father's argument that he was prejudiced by the passing references to a 2012 conversation. The allegations were collateral to the main issues raised at the termination proceeding, and there is no indication that the trial court even considered or weighed the substance of the alleged 2012 conversation.

- 22 -

Moreover, Father has not established any right to impeach Mother by calling a witness to the 2012 conversation. Therefore, no relief is due.

In his fourth issue on appeal, Father contends that the trial court committed prejudicial error by excluding testimony about the best interest of Child. In particular, Father complains that the trial court did not permit his counsel to present the testimony of his aunt, J.B., as to Father's "personality and just his likability with kids." *See* Father's Brief at 54-55 (quoting N.T., 4/4/19, at 154). Father also asserts that the trial court improperly sustained the objection by counsel for Mother and Stepfather to his counsel's offer of testimony from Paternal Grandfather~~mother~~ concerning instances in which Mother allegedly failed to be truthful that would have challenged Mother's credibility. *Id.* (citing N.T., 4/4/19, at 297-98). Father argues that the trial court's exclusion of his proffered testimony precluded him from being able to prove that termination and adoption would not be in Child's best interest. *Id.* at 55-56. Additionally, Father asserts that the trial court interrupted Father's questioning of witnesses and limited Father's ability to present evidence.

It is well settled that the decision to admit or exclude evidence is within the sound discretion of the trial court. *In re A.J.R.-H.*, 188 A.3d 1157, 1166-67 (Pa. 2018); *In re Baby Boy S.*, 615 A.2d 1355, 1361 (Pa. Super. 1992). Moreover, the trial court has discretion to impose reasonable limitations on the mode and manner of the presentation of evidence. *Cf.* Pa.R.E. 611(a).

"A reviewing court will not disturb these rulings absent an abuse of discretion." **A.J.R.-H.**, 188 A.3d at 1166 (citation omitted).

Following our review, we find no merit to Father's arguments. We agree with the trial court that testimony that Father interacted well with other children was not relevant to Child's needs and welfare. **See** 23 Pa.C.S. § 2511(b). Similarly, trial court acted within its discretion to preclude Paternal Grandfather's from testifying about prior instances in which Mother "failed to be truthful" regarding loans made to her before 2012. Accordingly, we find no error or abuse of discretion on the part of the trial court in refusing to admit Father's proffered testimony. **See A.J.R.-H.**, 188 A.3d at 1166.

In sum, this Court finds that the trial court's decision to terminate the parental rights of Father under Section 2511(a)(1) and (b) is supported by competent, clear and convincing evidence in the record. **See S.P.**, 47 A.3d at 826-27. This Court has stated that a parent's own feelings of love and affection for a child, alone, will not preclude termination of parental rights. **See In re L.M.**, 923 A.2d 505, 512 (Pa. Super. 2007). We have stated that a "child's life 'simply cannot be put on hold in the hope that [a parent] will summon the ability to handle the responsibilities of parenting.'" **Z.P.**, 994 A.2d at 1125 (citation omitted). Accordingly, we affirm the decree terminating the parental rights of Father pursuant to Section 2511(a)(1) and (b).

Decree affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 10/18/2019